Charles L. Kerr (CK 7416)
Craig B. Whitney (CW 4257)
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104-0012
Telephone:  (212) 468-8000

*Attorneys for Plaintiff Nutmeg Insurance Company*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------

|  |  |
|---|---|
| NUTMEG INSURANCE COMPANY, | : |
| Plaintiff, | : Civil Action No. 06 CV 6666 |
| -against- | : ECF CASE |
| ACTIVE MEDIA SERVICES, INC., | : **COMPLAINT** |
| Defendant. | : |

------------------------------------------------------------

 Plaintiff Nutmeg Insurance Company ("Plaintiff" or "Nutmeg"), by and through its undersigned counsel, Morrison & Foerster LLP, for its complaint against defendant Active Media Services, Inc. ("Defendant" or "Active"), alleges as follows:

### NATURE OF THE ACTION

 1. This action arises out of an award (the "Award"), issued by an Arbitration Panel (the "Panel"), holding that Active breached its Trade Credit Agreement (the "Agreement") with National Oilwell, Inc. ("National").

 2. Pursuant to the Agreement, Active was obligated to assist National in identifying and exploiting opportunities to barter trade credits for goods and services needed by National, as well as develop and maintain a market for the use of those trade credits.

 3. Through its broker, Active developed a program to insure the risk of using and consuming trade credits and solicited Reliance Insurance Company of Illinois ("Reliance") to

participate as the insurer in the program.  Specifically, in reliance upon Active fulfilling its obligations under the Agreement, Reliance, and subsequently Nutmeg, issued a Barter Trade Credit Insurance Policy (the "Policy") to National.  Under the Policy, Reliance and/or Nutmeg would pay to National the value of un-retired trade credits remaining at the end of the policy period, provided, *inter alia*, that Active, acting as Reliance's and/or Nutmeg's fiduciary, certified that National used "reasonable efforts" to retire the trade credits.

4.      Following the close of the policy period of the Policy, Active issued an "inaccurate, incomplete, and misleading report" to Nutmeg misrepresenting that National did not undertake "reasonable efforts" to consume trade credits as required under the Agreement and the Policy.

5.      Relying on Active's misrepresentations, Nutmeg denied National's claim. Thereafter, National commenced an action against both Active and Nutmeg and those claims were then arbitrated by the parties (the "Arbitration").  Following an eight-day arbitration hearing, the Panel held that, *inter alia*, Active and Nutmeg were jointly and severally liable to National for the value of the un-retired trade credits, plus pre-judgment interest and attorneys' fees, and that Nutmeg was additionally liable for its failure to timely pay the claim made by National under the Policy when due.  A true and correct copy of the Award is attached hereto as Exhibit A.

6.      Following entry of a judgment confirming the Award, Nutmeg was compelled to pay National $4,967,703.20, which included sums owed to National by Active, to release Nutmeg from any liability under the judgment and to avoid the accrual of further post-judgment interest.  In this action, Nutmeg seeks to recover from Active the amounts that Nutmeg paid to National as a result of Active's primary and active wrongdoing and Active's misrepresentations

and omissions and Active's breaches of its fiduciary duties to Nutmeg, as well as costs and attorneys' fees and such other and further relief against Active as this Court deems equitable and just.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over the causes of action asserted in this Complaint pursuant to 28 U.S.C. § 1332(a).  The parties are citizens of different States and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

8.      Venue is proper pursuant to 28 U.S.C. § 1391(a) in that Defendant resides in the Southern District of New York.

## PARTIES

9.      Plaintiff Nutmeg Insurance Company is a corporation organized under the laws of Connecticut, with its principal place of business in Hartford, Connecticut.

10.     Defendant Active Media Services, Inc. is a corporation organized under the laws of Delaware, with its principal place of business in Pearl River, New York.  Upon information and belief, from time to time Active Media Services, Inc. does business as Active International in connection with its trade credit programs.

## FACTUAL ALLEGATIONS

**A.      Active Creates the Trade Credit
Program and Solicits Insurance**

11.     Active is in the business of bartering trade credits.  The viability and legitimacy of Active's trade credit program is dependent upon Active's ability to develop and maintain a marketplace for its trade credits and to monitor the compliance of each participant in that program under their respective trade credit agreements.

12.     In or about 1995, Active began to market a new product—an *insured* trade credit program—through its newly established Trade Credit Department.  Reliance agreed to provide the necessary Barter Trade Credit Insurance Policies to program participants as part of Active's insured trade credit program.  In or about 2000—during the term of the Policy with National—Reliance was placed in conservatorship and its book of business with respect to this program was transferred to Nutmeg.  In connection with that transfer, Nutmeg issued its own policies to the participants in the insured trade credit program, including National, on the same policy terms and conditions as the original Reliance insurance policies.

13.     The existence of a barter trade credit insurance policy enabled Active to peddle this new insured trade credit program into new, untested markets, such as the oil and gas industry.

14.     Reliance and/or Nutmeg were willing to provide this type of insurance coverage as part of this insured trade credit program based upon Active's purported ability to create, maintain and monitor a market for the retirement of trade credits in these new industries.  Reliance and Nutmeg, in turn, relied upon Active's expertise and unique knowledge about trade credit programs and its good faith and claimed ability to develop and maintain an active marketplace in trade credits as a basis for agreeing to participate in these programs.  Accordingly, Active owed fiduciary duties to Reliance and/or Nutmeg under its insured trade credit program.

15.     As part of this insured trade credit program, Active included in its standard form Trade Credit Agreements a procedure, known as the Countertrade Consumption Procedure (the "CCP"), that required the program participant to use "reasonable efforts" in performing various tasks to assure that its trade credits were retired.

16.     More significantly, Active's standard form Trade Credit Agreement also required that the program participant agree to enter into a barter trade credit insurance policy under which Active would be responsible for warranting to the insurer the program participant's compliance with the CCP as a prerequisite for the insurer paying any claim for losses resulting from un-retired trade credits.

17.     The Notice of Loss provision in the Policy specifically required both the insured and Active to warrant to Reliance and/or Nutmeg that the insured had complied with the CCP.

**B.      National Joins Active's**
**        Insured Trade Credit Program**

18.     On or about February 26, 1998, National, a company that provides oilfield products and services for the worldwide oil and gas industry, entered into the Agreement with Active as part of Active's insured trade credit program.

19.     A condition of the Agreement was that National would separately enter into a "Trade Credits Insurance Policy" that would "pay the Insured the dollar value of the Trade Credits not consumed by the expiration of the policy period, subject to the terms and conditions contained in such policy."  Under this structure, the insurer that issued the Trade Credits Insurance Policy—in this case, Reliance and Nutmeg—was dependent upon National and Active fulfilling their respective obligations under the Agreement in good faith and upon Active's purported ability to create, maintain and monitor a market for National's trade credits in the oil and gas industry.

20.     In this regard, Active was to create a market for National's trade credits in the oil and gas industry and assist National in retiring its trade credits, and National was to use its reasonable efforts to retire trade credits as set forth in the CCP.

21.     The Agreement specifically recognized that National's and Active's performance of their obligations under the Agreement was for the benefit of an insurer such as Reliance and/or Nutmeg that issued a Trade Credits Insurance Policy associated with the Agreement.

22.     Accordingly, Active's trade credit program was structured and devised so that Nutmeg was placing its trust and confidence in Active both to create a market with sufficient market participants and liquidity that would allow National to retire trade credits and to assist National with those efforts.  Nutmeg was also relying on Active to be the primary determinant of whether National complied with the requirements of the CCP, which would be the principal condition governing National's entitlement to payment of loss under the Policy.

23.     Nutmeg continuously relied on Active's superior knowledge and expertise, both with respect to the trade credit industry and with respect to National's compliance with the CCP, and its efforts to retire trade credits to protect Nutmeg's interests in the insured trade credit program.

## C.     Active Continuously Misled Nutmeg During the Policy Period

24.     The Policy issued by Reliance and/or Nutmeg to National had a policy period from March 30, 1998 through March 30, 2001 (the "Policy Period").

25.     Active was the sole overseer of National's progress and performance under Active's insured trade credit program.

26.     Active, however, did not inform Reliance and/or Nutmeg of Active's inability during the Policy Period to create a viable market for trade credits in the oil and gas industry. Active also failed to disclose to Reliance and/or Nutmeg that, despite National's compliance with its obligations in presenting trade credit opportunities to Active, National's inability to retire a

substantial portion of its trade credits was due to Active's failure to perform its duties under the Agreement.

27.     During the first 21 months of the Policy Period, despite the numerous trade credit opportunities presented by National, Active was only able to assist National in retiring $25,000 out of $2,400,000 worth of trade credits.  The Panel found that Active had "fail[ed] to follow up with any meaningful pursuit of the Trade Credit opportunities identified by National."

28.     Further, as the Panel held, "in contrast to Active's pre-contract, comforting assurances that National would not have a heavy burden to carry under the CCP … and that Active would carry the laboring oar, Active raised the performance bar [for National's compliance with the CCP] after the first 18 months" of the Policy Period.

29.     During the last 15 months of the Policy Period (from approximately December 1999 through March 2001), Active consistently represented to Reliance and/or Nutmeg that National had presented no trade credit opportunities and had engaged in "no activity" after June 1999.  As found by the Panel, "[t]hese reports were inaccurate, incomplete and misleading."

30.     In February 2000, Active compounded its failure to assist National in retiring trade credits by virtually disbanding its Trade Credit Department and shutting down its insured trade credit program.

31.     Not surprisingly, and perhaps inevitably, not a single trade credit was retired by National during the remainder of the Policy Period, or any time thereafter.  Accordingly, as of the end of the Policy Period, National had only retired $25,000 in trade credits out of a total of $2,400,000 in trade credits it had purchased under Active's insured trade credit program.

**D.      Active's Wrongful Conduct**
        <u>Continued Following the Policy Period</u>

32.      As a precondition for payment of loss under the Policy, the Notice of Loss

provision required that Active warrant National's compliance with the CCP.  This requirement in

the Policy reflected the fact that Nutmeg was relying upon Active's superior knowledge and

expertise with respect to National's compliance with the CCP and its efforts to retire trade credits

under the trade credit program.

33.      On or around February 7, 2002, National submitted documentation in support of

its claim of loss.  Following receipt of this documentation, Nutmeg undertook an investigation of

National's claim.

34.      Around the same time, Active submitted its Compliance Review to Nutmeg,

which concluded that "NATIONAL OILWELL is not in compliance with an agreed to

consumption procedure.  Comments: Account was in compliance for the first 18 months then

National Oilwell sold the business unit to Sooner (a change of control).  After the sale, no

opportunities were presented to Active."  The Compliance Review listed eight separate breaches

by National of the CCP, and indicated that National was not in compliance with the CCP as of at

least March 31, 2000 through the end of the Policy Period.

35.      As found by the Panel, "Active declined to warrant that National had complied

with the material provisions of the CCP to the best of its ability.  Instead, Active submitted an

inaccurate, incomplete, and misleading report affirmatively indicating that National had breached

virtually every one of its material obligations in the CCP."

36.      In particular, Active failed to disclose to Nutmeg the numerous ongoing trade

credit retirement activities undertaken by National and, instead, represented to Nutmeg that

National made virtually no effort to retire trade credits after November 1999.  Further, Active

failed to disclose to Nutmeg that National's failure to retire more than $25,000 worth of trade credits was primarily due to Active's inability to create and maintain a market for National's trade credits in the oil and gas industry and that internal issues within Active had resulted in Active virtually disbanding its Trade Credit Department altogether in February 2000.

37.     On or around August 14, 2002, as part of Nutmeg's continuing investigation of National's claim of loss, Nutmeg met with Active's former Executive Vice President and another individual, who, upon information and belief, had been responsible for Active's Compliance Review, to discuss the methodology for compiling the review.  Throughout the course of this meeting, these individuals maintained a firm conviction that National had failed to comply with the requirements of the CCP.

38.     On or around October 22, 2002, Nutmeg met with National to inform National of the status of the investigation and to provide National with an opportunity to present further evidence in support of its claim of loss.

39.     Throughout Nutmeg's investigation of the Notice of Loss submitted by National, Active repeatedly misrepresented to Nutmeg that National had failed to comply with the CCP, and that National's inability to retire more than $25,000 worth of trade credits in three years was entirely National's fault.  Active also failed to disclose material facts relating to National's efforts to comply with the CCP.

40.     Based primarily on these false, inaccurate, incomplete and misleading reports and representations by Active, Nutmeg ultimately denied National's claim in or around December 2002.

E.     **The Panel Found That**
       **<u>Active Breached the Agreement</u>**

41.     Nutmeg continued its discussions with National even after denying the claim submitted by National under the Policy in an attempt to reach an agreement among the parties that would avoid any potential future litigation over this issue.

42.     On or around July 30, 2003, however, National commenced an action in the District Court of Harris County, Texas (the "Texas State Court Action") against Active and Nutmeg for breach of contract, fraud and violations of the Texas Insurance Code.

43.     Pursuant to the arbitration provision in the Policy, the Texas State Court Action was stayed and National, Active and Nutmeg were compelled to arbitrate their claims in the Arbitration.  As part of that Arbitration, the parties engaged in discovery, motion practice and negotiation prior to the arbitration hearing in December 2005.

44.     During this entire period, Active never backed away from its position that National was to blame for the failure to retire additional trade credits.  Instead, Active continued to mislead and misinform Nutmeg regarding Active's and National's performance under the Agreement, Active's insured trade credit program generally and Active's efforts to create, maintain and monitor a market for National's trade credits in the oil and gas industry.

45.     On or around January 30, 2006, the Panel issued its Award finding Active and Nutmeg liable for breach of contract and holding the parties jointly and severally liable to National for damages, pre-award interest and attorneys' fees in the amount of $3,517,774.40. The Panel found that Active had failed to follow up with any meaningful pursuit of trade credit opportunities identified by National, that Active had consistently omitted and/or misrepresented National's efforts under the Agreement in its reports to Nutmeg, that Active virtually disbanded its Trade Credit Department in February 2000, that Active submitted an inaccurate, incomplete

and misleading report to Nutmeg regarding National's lack of compliance with the CCP and that that Active breached its duty to act in good faith under the Agreement.

46.     The Panel also found Nutmeg liable for a violation of Texas Insurance Code Article 21.55, which, as the Panel noted, "requires that valid insurance claims [] be paid no later than 60 days after the insurer's 'receipt of all items, statements and forms reasonably requested and required ….'"  As a result, Nutmeg was assessed a statutory interest penalty of 18% per annum of the claim amount, starting March 1, 2002, which resulted in an additional $1,610,441.25 in statutory interest damages.

47.     In addition, the Panel held that responsibility for payment of all administrative fees and expenses of the American Arbitration Association and the compensation and expenses of the arbitrators was to be borne solely and entirely by Active.  Consequently, Active was ordered to reimburse Nutmeg in the amount of $72,690.42, representing that portion of the fees and expenses in excess of the apportioned costs incurred by Nutmeg.

**F.     Nutmeg Paid
the Final Judgment**

48.     On or around March 2, 2006, the District Court of Harris County, Texas, issued an Order Confirming Arbitration Award and Final Judgment in the Texas State Court Action (the "Final Judgment").  A true and correct copy of the Final Judgment is attached hereto as Exhibit B.  Thereafter, on or about March 7, 2006, Nutmeg and National entered into a Partial Release of Final Judgment (the "Partial Release").

49.     In the Partial Release, National and Nutmeg agreed and acknowledged that "Nutmeg wishes to have the $3.5MM Award (plus interest due thereon) promptly discharged in order to avoid the accrual of post-judgment interest and the possibility of execution by National-Oilwell upon Nutmeg's assets."  National and Nutmeg further acknowledged that Nutmeg found

it necessary to pay to National the entire $3.5MM Award (plus all interest due thereon) "not as a volunteer but under compulsion of a legal judgment and to avoid additional losses and damages."

50.     In connection with the Partial Release, Nutmeg paid National $3,521,268.10 (comprised of $3,517,774.40 in judgment principal plus five days' post-judgment interest at $698.74 per day) to fully release and discharge that part of the Final Judgment under which Active and Nutmeg were jointly and severally liable to National for $2,375,000.00 in principal damages, $421,774.48 in pre-judgment interest and $721,000.00 in attorneys' fees.  Nutmeg also paid National $1,446,435.10 to fully release and discharge that part of the Final Judgment under which Nutmeg was liable to National for statutory interest based on the Panel's finding that Nutmeg had failed to adjust National's claim under the Policy within 60 days.

51.     Upon information and belief, to date, Active has not paid any portion of the Final Judgment to National and/or to Nutmeg.

## FIRST CLAIM

## BREACH OF FIDUCIARY DUTY

52.     Nutmeg incorporates by reference the allegations set forth in Paragraphs 1 through 51 as if fully set forth herein.

53.     In agreeing to participate as an insurer for National in Active's insured trade credit program, Nutmeg was required to place a unique degree of trust and confidence in Active's ability to develop and maintain a marketplace for the purchase and sale of trade credits and Active's good faith monitoring and reporting about National's compliance with the Agreement and the CCP.  Because of Active's long-standing involvement in the trade credit business, its unique position as the trading company that was developing and maintaining the trade credit market and bringing other participants into the program and introducing them to

National, and its express obligations to monitor and report upon National's compliance under the Agreement, Active had a unique and dominant role in the program and superior knowledge about its operation.

54.   The structure of Active's insured trade credit program, including the barter trade credit insurance policy that is part of that program, contemplated that Nutmeg would bestow a high degree of trust and confidence in Active to develop and maintain its trade credit program and perform its duties under the program honestly and with care.

55.   Given the structure of Active's insured trade credit program, Nutmeg was unable to independently monitor or control Active's or National's activities, performance or behavior under Active's insured trade credit program.  Nutmeg reasonably and properly relied on Active's superior knowledge and control to inform Nutmeg as to whether National had properly performed under Active's insured trade credit program and complied with the requirements of the Agreement.

56.   Further, Nutmeg reasonably and properly relied on Active to act in Nutmeg's best interests to create and maintain a market for the use of National's trade credits, as well as assist National in using its trade credits as contemplated by the terms of the Agreement and Active's trade credit program in general.

57.   Based on this unique degree of trust and confidence between the parties and Active's superior knowledge, skill and expertise with respect to the insured trade credit program, Active owed Nutmeg a fiduciary duty of care, fair dealing, loyalty and honesty.

58.   Active breached its fiduciary duties to Nutmeg by, among other things, failing to follow up with any meaningful pursuit of the trade credit opportunities identified by National, virtually disbanding its Trade Credit Department with over a year left on the Policy Period,

submitting "inaccurate, incomplete and misleading" reports to Nutmeg regarding National's performance during the Policy term, and submitting an "inaccurate, incomplete and misleading report affirmatively indicating that National had breached virtually every one of its material obligations in the CCP" during the determination of National's claim under the Policy.

59.     Active's fiduciary duties continued throughout the claim period until and including the Arbitration and subsequent confirmation of the Award.  Throughout this period, Active continuously breached its duties of care, fair dealing, loyalty and honesty by representing to Nutmeg that National had failed to comply with the Agreement and the CCP and that Active was willing and able to retire National's trade credits during the Policy Period.

60.     As a result of the foregoing breach, Nutmeg denied National's claim under the Policy.

61.     The Panel subsequently determined, however, that National had complied with the requirements of the CCP, notwithstanding Active's "inaccurate, incomplete and misleading" reports to Nutmeg to the contrary.

62.     Under the Award and the Final Judgment, Nutmeg was found jointly and severally liable, along with Active, for $3,517,774.40, which included the principal damages under the Policy, as well as pre-award interest and attorneys' fees.  Nutmeg paid this amount in full to National to avoid the imposition of additional post-judgment interest.

63.     The Panel's finding of liability in the Award with respect to the principal damages, pre-award interest and attorneys' fees was the result of Active's primary and active wrongdoing, including its breach of its fiduciary duties owed to Nutmeg.

64.     The Panel's finding of liability in the Award with respect to $1,610,441.25 in statutory interest damages was also the result of Active's primary and active wrongdoing, including its breach of its fiduciary duties owed to Nutmeg.

65.     Nutmeg has been damaged as a result of Active's breach of its fiduciary duties.

<u>SECOND CLAIM</u>

<u>NEGLIGENT MISREPRESENTATION</u>

66.     Nutmeg incorporates by reference the allegations set forth in Paragraphs 1 through 65 as if fully set forth herein.

67.     Active had a duty to use reasonable care to impart correct information to Nutmeg regarding Active's insured trade credit program due to the special relationship between Active and Nutmeg created by the structure of Active's trade credit program.  Nutmeg was justifiably relying on Active to develop and maintain a marketplace in the oil and gas industry for National's trade credits, and to monitor and report on National's compliance with the terms of the Agreement and the CCP.

68.     Active, in the course of its business, failed to exercise reasonable care in providing information to Nutmeg regarding National's behavior under Active's insured trade credit program and National's failure to comply with the requirements of the Agreement and the CCP.  Active also failed to exercise reasonable care in providing information to Nutmeg regarding Active's own conduct under its insured trade credit program, including its failure to follow up with any meaningful pursuit of the trade credit opportunities identified by National and the disbanding of its Trade Credit Department with over a year left on the Policy Period.

69.     Throughout the claim period, until and including the Arbitration and subsequent confirmation of the Award, Active continued to owe Nutmeg a duty to use reasonable care and

continuously failed to exercise reasonable care in providing information to Nutmeg regarding National's behavior under Active's insured trade credit program and Active's ability to develop, maintain and monitor a market for trade credits in the oil and gas industry.

70.     Active, in the course of its business, provided Nutmeg with false and misleading information regarding Active's trade credit program, National's behavior under Active's insured trade credit program and National's failure to comply with the requirements of the Agreement and the CCP.  Active's breach of its duties to Nutmeg continued throughout the claim period until and including the Arbitration and subsequent confirmation of the Award.

71.     In justifiable reliance on Active's misrepresentations, Nutmeg denied National's claim under the Policy, and maintained a position through the Arbitration that National had failed to comply with the terms of the Agreement and the CCP.

72.     The Panel's finding of liability in the Award with respect to the principal damages, pre-award interest and attorneys' fees was the result of Active's primary and active wrongdoing, including its negligent misrepresentations to Nutmeg.

73.     The Panel's finding of liability in the Award with respect to $1,610,441.25 in statutory interest damages was also the result of Active's primary and active wrongdoing, including its negligent misrepresentations to Nutmeg.

74.     Nutmeg has been damaged as a result of Active's negligent misrepresentations.

<u>THIRD CLAIM</u>

<u>BREACH OF CONTRACT AND BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (AS INTENDED THIRD-PARTY BENEFICIARY)</u>

75.     Nutmeg incorporates by reference the allegations set forth in Paragraphs 1 through 74 as if fully set forth herein.

76.     The Agreement was a valid and binding contract between Active and National.

77.     As the insurer involved in Active's insured trade credit program with National, Nutmeg was an intended third-party beneficiary under the Agreement.  The parties to the Agreement both explicitly and implicitly contemplated that the insurer under a barter trade credit insurance policy issued in connection with the Agreement would directly and immediately benefit from Active's and National's performance under the Agreement.

78.     Active and National were aware at the time of drafting and signing the Agreement —which was expressly conditioned upon National entering into a trade credit insurance policy (a sample of which was included as an attachment to the Agreement)—that the insurer under that policy was an intended beneficiary of Active's and National's performance under the Agreement.

79.     Active has breached its duties under the Agreement and failed to perform its obligations in good faith.

80.     In its Award, the Panel found:

> The Agreement, read as a whole, and especially in light of the parties' three-year course of dealing, contemplated that Active would monitor National's performance of the CCP and report the results of such monitoring to Nutmeg.  The Agreement further contemplated that, in the event of an insurance claim, Active would either warrant National's performance or be unable to do so because of National's lack of substantial performance.  Under New York law, which governs the Agreement, Active had a duty to perform these obligations in good faith.  It failed to do so and thus breached the Agreement ….  Nutmeg relied on Active's reporting, and Active's refusal to certify CCP compliance was a reason for Nutmeg's denial of National's insurance claim.

81.     Active breached its explicit and implied duties under the Agreement by, among other things, failing to create and maintain a viable market in the oil and gas industry in which to enable National to retire trade credits, failing to follow up with a meaningful pursuit of the trade

credit opportunities presented to it by National, and disbanding its Trade Credit Department with over a year remaining in the Policy Period.

82.     As a result of Active's breach, Nutmeg was found jointly and severally liable, along with Active, for the $3,517,774.40, which included the principal damages under the Policy, as well as pre-award interest and attorneys' fees, all of which were foreseeable consequences of Active's breach.  Nutmeg paid this amount in full to National to avoid the imposition of additional post-judgment interest.

83.     Nutmeg has been damaged as a result of Active's breach.

<u>FOURTH CLAIM</u>

<u>EQUITABLE SUBROGATION</u>

84.     Nutmeg incorporates by reference the allegations set forth in Paragraphs 1 through 83 as if fully set forth herein.

85.     As found by the Panel, Nutmeg's liability for the $3,517,774.40 in the Award was based on its role as insurer to National's loss under the Policy it issued to National.  Active's conduct in breaching the Agreement and its corresponding implied covenant of good faith and fair dealing was the actual cause of loss to National, including both the principal damages of $2,375,000.00 and the additional $1,142,774.48 in pre-judgment interest and attorneys' fees.

86.     Active's failure to create and maintain a viable market for trade credits in the oil and gas industry, its failure to follow through on the trade credit opportunities presented by National and the disbanding of its Trade Credit Department, among other wrongful acts by Active, resulted in National's inability to retire more than $25,000 worth of trade credits during the three-year Policy Period.

87.     Additionally, Active's consistent issuance of inaccurate, incomplete and misleading reports to Nutmeg regarding National's failure to comply with the Agreement and the CCP resulted in Nutmeg denying coverage to National under the Policy.

88.     Nutmeg did not voluntarily pay the $3,521,268.10 to National in satisfaction of the Final Judgment, but rather was compelled to pay that amount by legal judgment and to avoid the accrual of further post-judgment interest and the possibility of execution by National upon Nutmeg's assets.

89.     By paying the debt for which Active was primarily liable, Nutmeg has been subrogated to National's right to collect on that debt from Active.

90.     Accordingly, Nutmeg is entitled to recover from Active as subrogee to National's claim against Active for damage caused by Active's breach of the Agreement.

91.     In addition, Nutmeg is also entitled to recover from Active pre-judgment and post-judgment interest on the amounts for which Active has been found liable to National, in an amount not less than the Panel's imposition of 7.25% per annum in interest.

FIFTH CLAIM

IMPLIED INDEMNITY

92.     Nutmeg incorporates by reference the allegations set forth in Paragraphs 1 through 91 as if fully set forth herein.

93.     Nutmeg was compelled to pay $3,521,268.10 to National, including $2,375,000.00 in principal damages and an additional $1,142,774.48 in pre-judgment interest and attorneys' fees, to satisfy the Final Judgment.

94.     Nutmeg's payment should have been made by Active, who was primarily and actively responsible for the harm.

95.     Active's breach of the Agreement was an independent wrongdoing committed solely by Active, separate from any finding by the Panel with regard to Nutmeg.

96.     Active will be unjustly enriched if it is able to avoid payment of its liability to National because Nutmeg was compelled to pay National for the harm caused by Active.

97.     Accordingly, Nutmeg has an implied right to indemnity from Active for the amount paid by Nutmeg to National.  Nutmeg also has the right to recover its attorneys' fees incurred in defending the action brought by National.

SIXTH CLAIM

IMPLIED-IN-LAW CONTRACT

98.     Nutmeg incorporates by reference the allegations set forth in Paragraphs 1 through 97 as if fully set forth herein.

99.     Active was found liable to National, but, upon information and belief, has not paid any amount for its liability.

100.     Under these circumstances, Active has retained money that it should have paid, and Nutmeg has paid money that it should have retained.  Active will be unjustly enriched if it is able to avoid payment of its liability to National because Nutmeg was compelled to pay National for the harm caused by Active.

101.     Accordingly, an implied-in-law contract exists between Active and Nutmeg for Active to pay Nutmeg the amount Nutmeg was forced to pay, and that Active avoided paying, as a result of Active's wrongdoing.

## SEVENTH CLAIM

## EQUITABLE CONTRIBUTION

102.    Nutmeg incorporates by reference the allegations set forth in Paragraphs 1 through 101 as if fully set forth herein.

103.    In partial satisfaction of Active's joint and several liability to National under the Award and Final Judgment, Nutmeg has paid $3,521,268.10 to National.

104.    Active will be unjustly enriched if it is able to avoid payment of its liability to National because Nutmeg was compelled to pay the $3,521,268.10 to National.

105.    Accordingly, if Nutmeg is denied relief for its claims asserted above, Nutmeg alternatively has a right to equitable contribution from Active for Active's proportionate share of the harm for which it was found jointly and severally liable.

## EIGHTH CLAIM

## ENFORCEMENT OF JUDGMENT

106.    Nutmeg incorporates by reference the allegations set forth in Paragraphs 1 through 105 as if fully set forth herein.

107.    On March 2, 2006, the District Court of Harris County, Texas, issued an Order Confirming Arbitration Award and Final Judgment.

108.    The Court ordered, adjudged and decreed that:

> (i) Nutmeg have judgment and shall recover from Active the amount of $72,690.42 as reimbursement for AAA administrative fees and expenses and the compensation and expenses of the arbitration panel.

> (ii) Beginning March 2, 2006, post-judgment interest shall accrue at the rate of 7.25% per annum on the amount of $72,690.42 owed by Active to Nutmeg.  This equates to $14.44 per day, and post-judgment interest shall continue to accrue on the amount of $72,690.42 until Active pays this portion of the judgment in full.

109.    To date, Active has paid no portion of the $72,690.42 owed to Nutmeg.

110.    Nutmeg has been damaged by Active's failure to pay, and is entitled to recovery of $72,690.42 based on the Final Judgment in the Texas State Court Action, plus interest at the rate not less than 7.25% per annum from March 2, 2006, until the date that Active pays the judgment in full.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment as follows:

(A)    With respect to the First Claim for Relief, holding that Active owed a fiduciary duty to Nutmeg, that Active breached that duty and awarding Nutmeg damages resulting therefrom in an amount to be determined at trial;

(B)    With respect to the Second Claim for Relief, holding that Active negligently misrepresented information to Nutmeg and awarding Nutmeg damages resulting therefrom in an amount to be determined at trial;

(C)    With respect to the Third Claim for Relief, holding that Nutmeg was an intended third-party beneficiary to the Trade Credit Agreement between Active and National, that Active breached its duties under that Agreement and awarding Nutmeg damages resulting therefrom in an amount to be determined at trial;

(D)    With respect to the Fourth Claim for Relief, holding that that Nutmeg has subrogated to National's claims against Active to recover the damages caused by Active's breach of the Trade Credit Agreement and awarding Nutmeg damages in an amount to be determined at trial;

(E)    With respect to the Fifth Claim for Relief, holding that Nutmeg has an implied right to indemnity from Active and awarding Nutmeg damages in an amount to be determined at trial;

(F)     With respect to the Sixth Claim for Relief, holding that Nutmeg and Active have an implied-in-law contract and awarding Nutmeg damages in an amount to be determined at trial;

(G)     With respect to the Seventh Claim for Relief, awarding Nutmeg damages in an amount to be determined at trial;

(H)     With respect to the Eighth Claim for Relief, awarding Nutmeg damages in the amount of $72,690.42 plus interest at a rate of not less than 7.25% per annum beginning March 2, 2006;

(I)     Award any additional compensatory and punitive damages, including interest thereon, in an amount to be determined at trial;

(J)     Awarding Nutmeg its attorneys' fees, costs and disbursements; and

(K)     Granting Nutmeg such other and further relief as the Court may deem just and proper.

Dated:  September 1, 2006
          New York, New York


                                            MORRISON & FOERSTER LLP


                                            By:   ___S/ Charles L. Kerr_____
                                                  Charles L. Kerr (CK 7416)
                                                  Craig B. Whitney (CW 4257)

                                            Attorneys for Plaintiff
                                            1290 Avenue of the Americas
                                            New York, New York 10104
                                            (212) 468-8000